MOLONEY v. CRESSLER et al.

CRESSLER v. MOLONEY.

(Circuit Court of Appeals, Seventh Circuit. October 7, 1913.)

Nos. 1,912, 1,921.

1. REMOVAL OF CAUSES (§ 48*) — SEPARABLE CONTROVERSIES — SEPARATE RELIEF AGAINST REMOVING DEFENDANT.

To ascertain the removability of a cause on the ground of the existence of a separable controversy, these tests are established: (1) there must be a separable and distinct controversy between the removing party and his adversary which can be fully determined as between them; and (2) the whole subject-matter must be capable of being so determined and complete relief afforded as to the separate cause of action without the presence of others originally made parties to the suit.

[Ed. Note.—For other cases, see Removal of Causes, Cent. Dig. §§ 93, 94; Dec. Dig. § 48.*]

2. REMOVAL OF CAUSES (§ 48*)—DIVERSITY OF CITIZENSHIP—SEPARABLE CONTROVERSY.

A bill alleged that complainant entered into a contract to purchase from one of the defendants a majority of the stock of a gas company which was placed in escrow with a partnership, the members of which were joined as defendants, to be delivered to complainant on payment by him of the stated purchase price; that the first-named defendant to induce the purchase made false and fraudulent representations as to the property of the gas company and agreed to make certain alterations and improvements in the plant at a stated cost which he had not done; that complainant rendered services in clearing the title to the property and oth-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

erwise for which such defendant should pay; and that the sum justly due complainant on account of such services and breaches of the contract, together with the payments made by him, exceeded the purchase price of the stock; but that the depositories refused to deliver the same to him. The bill prayed for an accounting, that complainant be permitted to recoup the amount found due him, offered to pay any balance found due from him, and that specific performance of the contract be decreed, and the depositories be required to deliver the stock to him. Such defendants answered disclaiming any interest in the stock, and offering to turn the same over as directed by the court. *Held*, that the bill was essentially one for specific performance of the contract, comprehending but a single issue, which was performance of the contract by complainant and a single ground for relief, that to enable the court to make such relief effective if granted the members of the depositary firm were indispensable parties, and, as some of them were citizens of the same state as complainant, the cause was not removable by the other defendant as involving a separable controversy.

[Ed. Note.—For other cases, see Removal of Causes, Cent. Dig. §§ 93, 94; Dec. Dig. § 48.*

Removal of cause, separable controversy, see notes to Robbins v. Ellenbogen, 18 C. C. A. 86; Mecke v. Valleytown Mineral Co., 35 C. C. A. 155; Pollitz v. Wabash R. Co., 100 C. C. A. 4.]

Appeal from the District Court of the United States for the Northern District of Illinois; George A. Carpenter, Judge.

Suit in equity by Maurice T. Moloney against Alfred D. Cressler and others. From the decree, complainant appeals. Reversed.

The appellant, Moloney, a citizen of Illinois, filed his bill in the circuit court for Cook county, against the appellee, Cressler, a citizen of Indiana, joining as parties defendant the members of the copartnership N. W. Harris & Co., a number of whom were citizens of Illinois, others of New York, others of Massachusetts.

The allegations of the bill are:

In December, 1898, Cressler represented to Moloney: (1) That he owned and controlled the capital stock of the Ottawa Gaslight & Coke Company, 450 shares of the par value of $100 per share; (2) that he desired to and would sell it to appellant for $115,000. (3) That the corporation owned a gas plant at Ottawa, Ill., which appellee intended putting in "first-class condition," giving in detail alterations, improvements, and repairs so contemplated. Appellant—being unacquainted with gas plants, their construction, operation, or the requisites of equipment or operation of a first-class plant—stated to the appellee that he would require a statement in writing showing the then condition of the gas plant; also, the main features of the contemplated improvements; that if he should agree to purchase such stock appellee "must agree to make all the repairs and improvements necessary to make such plant a first-class, well equipped gas plant, to be passed upon and approved by a thoroughly competent expert before acceptance," by appellant.

To the conditions last above, appellee assented, agreeing to furnish such written instrument, to make the repairs and improvements, the same to be completed not later than July 1899, if the contemplated purchase and sale was carried out. Appellee further represented good title in the corporation, subject only to a $25,000 mortgage; that an abstract of title would be furnished; that imperfection in title would be remedied; that all indebtedness of said corporation contracted prior to January 1, 1899, would be paid by him if the sale were consummated. Appellant was willing to risk $15,000 of his own money in purchasing the plant if it were improved as promised, but was unwilling to put in $115,000; and was willing to purchase it on condition that $100,000 could be borrowed on the security of the plant—to which appellee assented.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Thereupon the agreement was made, appellant to buy, appellee to sell, said stock for $115,000. The latter, pursuant to his promise, furnished appellant a written statement showing the extent and condition of, and the contemplated improvements to, the plant. It contained a description of the real estate and machinery; the projected additions and improvements, such as gasholder, hydraulic elevators, new pipe connections, tramway and dump car, repairs in purifying room, retort room changes, new boiler room as specified, painting buildings, etc.; all estimated to cost $17,000, and when completed, enable delivery of gas at a cost of one-half of gross receipts, i. e., if the latter were $30,000, the profit would be $15,000.

Such statement represented the coal gas and water gas capacities of the plant to be 170,000 and 150,000 cubic feet, respectively, per 24 hours. The connection, mains, leakage, and gas sales are detailed and described. It was therein further endeavored to demonstrate the effect of the contemplated improvements in increasing the earnings of the plant through a saving in items such as coal fuel expense, proper holding capacity, purifying, new tramway, etc., aggregating an amount to total of $2,520.27.

It was also in such statement declared that 21 miles of new mains had been laid, and most, if not all of the buildings erected in six years last past; 760 new meters had been purchased in such years, and in eight years last past improvements aggregating in cost $75,000 had been made. The holder was in good repair for substantial work.

This statement was made January 1, 1899. Appellant soon after the making of the agreement inquired of N. W. Harris & Co. whether $100,000 could be borrowed on the plant. They assured him that, in view of the contemplated improvements, such loan could be effected, on first mortgage, provided good title and corporate power in the company be shown.

After such assurances had been given, and, to wit, on March 22, 1899, appellee induced appellant to advance him $28,000 on account of the purchase. Thereupon an additional and supplemental contract was entered into, which recites the making of the agreement to sell for $115,000, and that an outstanding issue of $25,000 bonds is to be paid out of the purchase price; that certain improvements are to be made as per "plans and specifications" submitted; and contains these provisions:

(1) That appellant had paid $28,000 as part of $115,000, purchase price.

(2) Balance of consideration to be paid, the $25,000 of bonds to be deposited with N. W. Harris & Co. to be paid by them as directed by Cressler. When they have been paid, $20,000 in addition to be retained by them "until the improvements hereinbefore referred to are completed in said plant by Cressler."

(3) After payment of the bonds, Cressler shall receive the balance of the consideration except the $20,000 above specified to be held until improvements are made.

(4) Moloney "shall then be entitled to receive the said stock" controlling the company as of January 1, 1899. All outstanding indebtedness on that date to be paid by Cressler. Moloney thereafter to receive all benefits and bear the burdens.

(5) " * * * That the stock hereinafter referred to is placed with the agreement in the vaults of N. W. Harris & Co. as an escrow, to be delivered and the legal title of which to pass to the said Moloney when the said Cressler receives all of the consideration hereinbefore mentioned in manner and form as hereinbefore stated."

(6) Cressler to liquidate indebtedness owing and to receive moneys earned prior to January 1, 1899.

(7) Instrument executed in triplicate, "one to be deposited with the stock as aforesaid," the parties retaining the other two.

The bill further averred:

The furnishing of an abstract of title, which, being submitted to said N. W. Harris & Co., resulted in objections to the title. Appellant, as attorney, was instructed by Cressler to render the service necessary to clear the title. Such service was reasonably worth $600.

Cressler was unable to pay the $25,000 bonds. They were paid by Moloney, at Cressler's request, principal and interest, $27,708.95. He was put to large

expense in carrying out this request, which, with the reasonable value of his services as attorney in that behalf, amounted to $500.

After paying the $28,000, and before effecting the $100,000 loan, said N. W. Harris & Co. informed appellant that the gas company was forbidden to mortgage its property, and that the contemplated loan could not be made; but that such loan might be effected by organizing another corporation under a different law, which, when consolidated with the old company, could execute the mortgage to secure such loan. Thereupon Cressler advised Moloney to take the steps necessary to accomplish such purpose, and this was done. Moloney's expense in doing this was $175, the value of his services, $1,000.

The loan of $100,000 was accordingly effected August 15, 1899, and thereupon Moloney deposited with N. W. Harris & Co. the $20,000 to be paid for the improvement account as stated. Harris & Co. paid out of this for improvements which Cressler should have paid, $10,332.15, leaving in their hands $9,667.85.

Moloney, on August 15, 1899, paid Cressler $20,000, and August 18, $15,000 both on account of the purchase price and in reliance upon the agreement to improve the plant.

Moloney also collected outstandings of the company for which he is entitled to a reasonable collection fee.

Cressler failed to make the improvements necessary to put the plant in a first-class condition. Moloney expended for that purpose $16,000.

Cressler falsely represented to Moloney at the time the sale was negotiated that 21 miles of new mains had been laid within six years then last past, whereas in truth there were but 17 miles, 8 of which were not new, laid within six years, but in fact old and had been laid nearly forty years. His representations respecting the size of mains were false, many of such mains being much smaller than stated. He falsely represented the inlet and outlet connections to be eight inches, when in fact they were six; that the water gas machinery had a capacity of 150,000 feet per 24 hours, when it did not exceed 90,000. Moloney relied upon these representations which Cressler knew to be false, and has been damaged $15,000.

Cressler failed in his agreement to improve the plant and put it in a first-class condition by July 1, 1899. Much of the machinery was not of the quality specified, nor was it installed until more than two years after July 1, 1899. The holder to be erected was not properly constructed, having the defects detailed in the bill. The damage to appellant by reason thereof is set at $5,000.

Pursuant to the "supplemental agreement" of March 22, 1899, the stock certificates were placed in the hands of N. W. Harris & Co. "in escrow to be delivered to your orator upon your orator's payment of the purchase price of said stock." That such stock is now in their hands. "That your orator has paid the full purchase price of said shares of stock and has frequently demanded said certificates from said N. W. Harris & Co., and from said Cressler, but that said N. W. Harris & Co. as well as said Cressler refuses to deliver the same to your orator."

The bill concludes:

"And your orator further says that in justice and equity the several items of damage sustained by your orator by reason of the failure of said Cressler to perform his agreements, as is hereinbefore set forth and by reason of the false representations made as aforesaid by said Cressler and the moneys expended by said N. W. Harris & Co. and your orator as aforesaid, ought to be recouped from the purchase price of said shares of stock, and that your orator is justly and equitably entitled to compensation from the said Cressler for said services rendered and said expenses incurred by your orator at the request of said Cressler, and that the amount thereof should be set off against the purchase price of said shares of stock, and if such damages shall be recouped from, and such compensation for your orator's services and expenses, and moneys advanced and expended as aforesaid, shall be applied upon said purchase price then your orator has already paid to said Cressler more than the balance of said purchase price and said Cressler ought to be compelled to deliver the said shares of stock to your orator and to pay to your orator whatever sum your orator has overpaid upon said purchase price of said stock. And your orator

says that he has made frequent applications to said Cressler to come to an amicable settlement of the matters in dispute between them, but that said Cressler on various pretenses has utterly failed to do so.

"In consideration whereof * * * your orator now prays that the damages sustained by him as hereinbefore stated and set forth may be awarded and determined by or under the direction of this honorable court; and that the expenses incurred and the value of the services rendered by your orator for said Cressler, as hereinbefore stated, may be ascertained and determined in like manner; and that the amount of such damages, expenses, and value of your orator's said services, and money expended, when so ascertained, may be applied upon the purchase price of said shares of stock; and that an account may be taken under the direction of this honorable court of all and every, the said transactions and dealings between your orator and said Cressler; and that the same may be fully adjusted and the respective rights of your orator and said Cressler be ascertained; and that said Cressler may be decreed to pay to your orator what, if anything, shall appear upon such accounting to be due from him to your orator, your orator being ready and willing, and hereby offer, to pay to said Cressler what, if anything, shall appear to be due from him to said Cressler; and that said Cressler may be decreed to specifically perform his said agreements to sell said shares of stock to your orator, and to assign and deliver the same to your orator; and that said N. W. Harris & Co. be required and decreed to deliver said stock so in their possession to your orator; 'and that your orator may have such other and further relief in the premises as the circumstances of the case may require and to your honors shall seem meet."

The defendants N. W. Harris & Co. thereupon filed their answer admitting the allegations of the bill respecting the organization of the gas company, defendant's assurances to complainant that a loan of $100,000 could be obtained upon the conditions stated; that objections were raised, whereupon the formation of a new company and its consolidation and merger with the old was effected, resulting in the making of the loan 'as alleged; that on August 15, 1899, Moloney paid the answering defendants $20,000, which was "to be held in trust and paid to said Moloney or his order when the improvements under way have been completed and paid for and all claims against said estate extinguished"; out of the sum so deposited $10,332.21 was paid to Moloney, leaving the balance alleged. Defendants are informed that Cressler was the contractor for certain of the improvements and has a claim against the gas company on account thereof; but they do not know whether Moloney is entitled to the money balance in their hands.

The answer proceeds:

"And these defendants admit that there was deposited with said N. W. Harris & Co. by said Moloney and Cressler a package said to contain the stock of the Ottawa Gaslight & Coke Company, to be held by said N. W. Harris & Co. in escrow and to be delivered according to memorandum on said package, that these defendants are ignorant and do not know what is contained in said package, but show that a receipt was given by said N. W. Harris & Co. for said package in the words and figures following, to wit:

"  'Chicago, Mar. 24, 1899.

" 'Received of A. D. Cressler and M. T. Moloney, a sealed envelope said to contain $87,000 of stock of the Ottawa Gaslight and Coke Co., but the contents of which we have not examined, to be delivered according to the memorandum on the said envelope.                     N. W. Harris & Co., Chicago.
"  'G. W. Hoover, Cash.

"  'No. b. 419.'

"That the memorandum on said package was in the words and figures following, to wit:

"  'The within contains the stock of the Ottawa Gaslight & Coke Company, and a contract between A. D. Cressler and M. T. Moloney relating to the same.
"  'The contents are to be delivered to Moloney on payment to Cressler of $87,000, less $25,000 in bonds now outstanding and which are to be paid or taken up by Moloney.'

"And these defendants further answering say that said firm of N. W. Harris & Co. has always been and is willing to pay the amount of said balance remaining in their hands to such person or persons, as shall be lawfully entitled thereto and to whom they could deliver the same in safety, and deliver said package now in their possession to such person, or persons, as shall be lawfully entitled thereto and to whom they could deliver the same in safety, and they hereby offer to pay over and deliver unto such parties as this court shall direct the said money and package, or bring the same into court as the court shall direct for the benefit of such of said parties hereto as shall be entitled thereto, and these defendants disclaim all right and title of, in and to the same or any part thereof."

After the filing of such answer, the defendant Cressler appeared and filed his petition for removal of the cause to the United States Circuit Court, alleging therein the diversity of citizenship and that the controversy between the said Moloney, complainant, and Cressler, defendant, is a different and separable controversy from that between Moloney and the other defendants to the bill.

The cause having been removed, Moloney made a motion to remand it to the circuit court for Cook county, which was overruled.

The defendant appellee then answered, also presented his cross-bill for recovery of the balance due him upon the transaction; and upon the issues tendered by such pleadings the cause was heard, resulting in a decree whereby Moloney, after being credited with advances made by him in behalf of Cressler in respect of the agreed improvements, was adjudged to be indebted to the latter on the contract in the sum of $23,580.88, but that Moloney had suffered damage in the sum of $5,000 through Cressler's failure to make the improvements within the stipulated time, which was deducted from such contract indebtedness, leaving $18,580.88. The decree then directed that upon payment of this sum, with interest, aggregating $28,248.03, by Moloney to Cressler, the former shall be the "complete owner and entitled to take possession of * * * the stock held in escrow" by Harris, etc.

Complainant has appealed from such decree.

Hiram T. Gilbert, of Chicago, Ill., and Vincent Duncan, of Ottawa, Ill., for appellant.

William S. Oppenheim and Harrison Musgrave, both of Chicago, Ill., and John S. H. Lee, for appellees.

Before BAKER and SEAMAN, Circuit Judges, and GEIGER, District Judge.

GEIGER, District Judge (after stating the facts as above). [1] Was the cause properly removed? To ascertain the removability of a cause on the ground of the existence of a separable controversy, these tests are established:

(1) There must be a separate and distinct controversy between the removing party and his adversary, which can be fully determined as between them.

(2) The whole subject-matter must be capable of being so determined, and complete relief afforded as to the separate cause of action, without the presence of others originally made parties to the suit. Thayer v. Life Ass'n, 112 U. S. 717, 5 Sup. Ct. 355, 28 L. Ed. 864; Railway Co. v. Wilson, 114 U. S. 60, 5 Sup. Ct. 738, 29 L. Ed. 66; Crump v. Thurber, 115 U. S. 56, 5 Sup. Ct. 1154, 29 L. Ed. 328; Brooks v. Clark, 119 U. S. 502, 7 Sup. Ct. 301, 30 L. Ed. 482; Brown v. Trousdale, 138 U. S. 389, 11 Sup. Ct. 308, 34 L. Ed. 987; Torrence v. Shedd, 144 U. S. 527, 12 Sup. Ct. 726, 36 L. Ed. 528; Wilson v. Oswego Township, 151 U. S. 56, 14 Sup. Ct. 259, 38 L. Ed. 70.

The application of these tests involves recognition of the elementary principle that, in determining the jurisdiction of federal courts and the removal of causes thereto, indispensable parties only are considered— all others may be dismissed or disregarded if their presence would oust the jurisdiction or restrict the right.

[2]. The inquiry therefore is: What is the nature of the suit or controversy disclosed by complainant's bill; the object sought to be accomplished and the relief grantable; the essential determination therein; and, finally, the parties indispensably necessary to the accomplishment of such object and the granting of such relief?

The ultimate facts disclosed by the bill may be thus further summarized:

(1) That Moloney and Cressler entered into a contract for the purchase by the former from the latter of the gas stock described, at the price stipulated in the contract.

(2) That, to induce Moloney to make the purchase, Cressler made certain representations respecting the condition, equipment, and capacity of the gas plant owned by the corporation whose stock was the subject of purchase and sale.

(3) That Cressler also agreed, in consideration of the purchase and sale, to make specified changes and alterations in such gas plant, which were to cost an amount stated, and which, when made, would improve its condition and increase its efficiency.

(4) That representations made by Cressler respecting the condition, equipment, and efficiency of the plant, were false; that he failed to perform his agreement to improve the plant.

(5) That Moloney has paid a portion of the agreed purchase price— the balance he seeks to set off, or recoup against the damages sustained by him through the false representations, and the breaches of the agreement to improve the plant, whereof Cressler was guilty, as alleged.

(6) That Moloney has endeavored to induce Cressler to adjust the dispute which has arisen between them. He is ready and willing to pay such amount as, upon the determination of such dispute, may be found due from him to Cressler.

(7) By the agreement the gas stock was deposited with the defendants Harris & Co. to abide Moloney's performance in respect of payment. They now hold such stock, and he has demanded it. At the time of removal they had filed an answer disclaiming any interest in the stock and in certain funds in their hands; and offered to surrender the same as, and to whomsoever, the court may direct.

The appellant contends that the controversy, or the cause of action comprehended within the bill, pertains to the assertion and enforcement of the right which he acquired through his contract with Cressler, his right to the stock which is the subject-matter of that contract; that the dispute between the parties is over the performance of the reciprocal obligations of such contract, upon which depends the successful assertion of complainant's rights; that, although complainant has not paid the full stipulated money consideration to the defendant Cressler, yet the latter, through his actionable misrepresentations, through his breaches of the obligations to improve the gas plant, has damaged

complainant in an amount which, if and when ascertained and allowed, will more than equal the unpaid balance of such consideration; and the claim is made that such damages should, in equity, be set off and recouped against, or treated as the equivalent of, such balance; that the controversy thus tendered is one and inseparable, having but a single ground for the relief—which latter, to be adequate, must include compulsory surrender of the stock by Harris & Co. who have it in their possession.

On the other hand, to support the removal of the cause, it is urged by the appellee Cressler that it affirmatively appears that complainant has no recourse against the defendants Harris & Co. because the conditions of the escrow agreement have not been complied with; that an ascertainment of complainant's damages alleged to have arisen through Cressler's misrepresentations and breaches of the agreement can be had only upon the trial of what are really separate causes of action at law upon which affirmative relief may be awarded; that Harris & Co. have no interest therein and, for the determination thereof, are neither indispensably nor properly in the suit. Hence the controversy between Moloney and Cressler is asserted to be separable within the meaning of the removal act; and they alone are indispensable to the determination thereof; that Harris & Co. can be party to no controversy relating to the title of the stock until complainant has paid the consideration of, or performed, the contract; that the purpose of complainant's bill is to determine the state of the account between him and Cressler, and, until that is accomplished, he can enforce no right whatever against Harris & Co. as escrow, and they are not properly in court.

Upon the question of removability, we are concerned, as stated, with the nature of the controversy, its essential elements, and not its merits. Whether the cause of action, whose nature and purpose is disclosed, is legally sufficient, or whether the facts, if true, entitle complainant to relief, are not relevant inquiries. If therefore respect be given to the allegations of the bill showing that the contract for the purchase of the stock is the foundation of the relations between the complainant and both defendants Cressler and Harris & Co., that the dispute arises out of such contract, that such dispute concerns merely complainant's asserted right to the stock which was the subject-matter of the contract, if, further, we respect the prayer of the bill expressly asserting the object to be an adjudication of complainant's title and ownership of such stock, we are fairly warranted in saying that the suit is one to compel specific performance by the defendants of their obligation under such contract to vest the stock in complainant, when he had performed. Now it may be that complainant would, independently of such purpose, have a right of action at law against the defendant Cressler for damages arising either through the false representations or through the breaches of the agreement, or that he could recover the reasonable value of professional services rendered as stated in the bill. But, when the dominant contract relation between the parties is considered in connection with the expressed purpose sought to be accomplished, then these so-called affirmative grounds of relief become

significant only as subordinate elements through which complainant seeks to establish his main ground of performance—upon which latter he asserts his right. They have an evidentiary purpose only. True, they may not establish payment or performance, or the equivalent thereof; but that does not call in question the real nature of complainant's suit, nor the ultimate object sought to be accomplished as one of specific performance. To say that, because the bill affirmatively shows a failure to pay the stipulated money consideration, it therefore fails to state any grounds for relief against the escrow or bailee, is but to deny what complainant seeks to establish—a denial of merit, but, by implication, an admission of the character of the suit and the object sought to be accomplished. In effect, it is an assertion that the cause should not be removed because complainant cannot prevail upon the merits against one of the defendants; whereas, the test is whether such defendant need be present to enable complainant to press the controversy, and, if successful, to obtain the full relief to which he is entitled.

The controversy therefore concerns complainant's right to the stock which was the subject-matter of the contract with the defendant Cressler. The essential elements to be established in order that he may prevail in the assertion and enforcement of that right are (1) the contract, (2) his performance, and (3) the refusal of defendant. Now the right, to be thus asserted and enforced, is not satisfied by an adjudication that Cressler, who agreed to sell the stock, perform his obligation; but that every one who, by virtue of that contract, could withhold from complainant the enjoyment of the right if he has not performed his obligation, shall also perform—and yield the title and possession, if the complainant is adjudged to have performed. In other words, to maintain his suit against Cressler, complainant must establish the contract and that he has paid or performed. To maintain it against Harris & Co. he must establish that he has paid or performed. Either can or could refuse to give up the stock solely upon the ground of nonperformance. That is the only ground of the controversy.

The view that Harris & Co., holding the stock under the contract whose enforcement is thus sought, are indispensably necessary parties to a suit brought for that purpose, is fully supported by St. Louis & San Francisco Ry. Co. v. Wilson, 114 U. S. 60, 5 Sup. Ct. 738, 29 L. Ed. 66; Wilson v. Oswego Township, 151 U. S. 56, 14 Sup. Ct. 259, 38 L. Ed. 70; Construction Co. v. Cane Creek Township, 155 U. S. 283, 15 Sup. Ct. 91, 39 L. Ed. 152; Crump v. Thurber, 115 U. S. 56, 5 Sup. Ct. 1154, 29 L. Ed. 328.

The importance of the question as one of jurisdiction justifies an analysis and review of three of these cases.

In St. Louis & San Francisco Ry. Co. v. Wilson, complainant, a citizen of Missouri, brought suit against a Missouri corporation joining two codefendants, citizens of New York, praying for the transfer to him of stock in said corporation standing in the name of such codefendants. After removal, the cause was ordered remanded; and the Supreme Court, affirming such order, said:

"There is but one controversy in this case, and that is as to the duty of the railroad company (defendant) to transfer to Wilson (complainant) the stock standing in the name of the Seligmans on its books and to issue new certificates therefor. Upon the one side of that controversy is the plaintiff, a citizen of Missouri, and on the other side the railroad company, a Missouri corporation. The sole purpose of the suit is to establish the duty and enforce its performance. This cannot be done without the presence of the company, for it is upon the company itself that the decree must operate. The Seligmans are made parties only in aid of the principal relief which is asked. As the stock stands in their names on the books, the company may well claim a judicial finding in the cause which shall bind them, if upon the final hearing a transfer is ordered. The suit therefore is in truth and in form against both the company and the Seligmans on a single cause of action, and cannot be removed unless the separate answer of the Seligmans introduces a separate controversy. This we have held in Louisville & Nashville R. Co. v. Ide [114 U. S. 52, 5 Sup. Ct. 735, 29 L. Ed. 63], just decided, is not necessarily the effect of separate issues under separate defenses to the same action. No relief whatever can be granted unless it is found to be the duty of the company to transfer the stock, and as to that controversy the company is an indispensable party."

In Wilson v. Oswego Township, the facts were:

A Missouri railroad corporation, as an aid in the construction of its road, received from Oswego township (Kansas) certain bonds. One Burgess, a citizen of Missouri, had contracted for and was proceeding with the contruction work of a portion of the road. Pending this, at the request of Burgess and in consideration of the work performed and to be performed, the railroad company delivered to him and to one Montague (Kansas) as trustee, jointly, certain of the bonds "upon the agreement and understanding between the railroad company, Burgess and Montague, that upon completion of the work then in progress on the railroad, up to the amount of the value of the * * * bonds, Montague would relinquish for himself and for all others, these bonds to Burgess, which would then become the absolute property of the latter." To carry out this arrangement, the bonds were placed by Burgess and Montague, jointly, with the Union Savings Association as trustee or bailee (a Missouri corporation) there to remain until completion of the work by Burgess, then to be delivered to him upon the joint order of himself and Montague. Thereafter, Wilson, as assignee of Burgess, filed suit in the Missouri state court, the savings association, railway company, and Montague being defendants therein, charging that Burgess had completed the work as agreed, thereby became entitled to the bonds, and that Montague had ceased to have any right thereto. The railway company defaulted, the Union Savings Association answered offering to surrender the bonds to the party legally entitled thereto. Oswego Township intervened and joined with Montague in a petition to remove the cause, alleging the existence of a separable controversy.

The Supreme Court reversed the judgment upon the ground that the cause had been improperly removed, saying:

"The plaintiff, as his assignee, claimed that Burgess had complied with and completed his contract, thereby becoming the owner of the bonds, and entitled to their possession; and that thereafter he assigned his right, title, and interest in the same to the plaintiff, who by his petition only sought to recover possession of the bonds. The Union Savings Association, being the bailee or trustee of the bonds, was a necessary and indispensable party to the relief sought

by the petition, and that defendant, being a citizen of the same state with the plaintiff, there was no right of removal on the part of Montague, or of the intervening defendant, the Oswego township, on the ground that the Union Savings Association was a formal, unnecessary, or nominal party.  *  *  *

"Considering the nature of the suit and the relief sought thereby, these defendants cannot be treated and regarded as purely formal and unnecessary parties. The character of the relief sought made the Union Savings Association, which occupied the position of a bailee or trustee, a necessary and indispensable party.  *  *  *

"Considering the character of the relief sought by the original bill, and the situation of the parties, it cannot be properly said that the whole subject-matter of the suit was capable of being finally determined between the plaintiff, on the one side, and Montague and the Oswego township, on the other, without the presence of the Union Savings Association, so as to warrant the removal as a separable controversy."

In Construction Co. v. Cane Creek Township, complainant commenced suit in the United States Circuit Court for the District of South Carolina, against Cane Creek township, a citizen of the latter state, joining as codefendant Boston Safe Deposit & Trust Company, a citizen of Massachusetts, the state of complainant's citizenship. The bill averred that bonds of the defendant township had been deposited with the defendant trust company, to be delivered to complainant upon completion of a certain railroad as agreed; that the road had been completed, but that the certificate evidencing such completion was wrongfully withheld by the commissioners who were required to execute it; that the defendant trust company had and claimed no interest in the bonds. The prayer was that the defendant township be required to specifically perform its agreement by "assenting to the delivery" of the bonds in the hands of the trust company defendant; and that the latter be decreed to deliver them to complainant. The jurisdiction of the court was challenged because the defendant trust company and complainant were of the same citizenship. Such exception to the jurisdiction was overruled, and complainant was awarded a decree. Obviously, the question presented involved the status of the defendant trust company as a party. Mr. Justice Brewer said:

"The plea to the jurisdiction should have been sustained. The substantial object of the suit was to obtain possession of the bonds. The deposit and trust company was the party in possession, and, although it claimed no interest in the bonds as against the plaintiff and its codefendant, yet possession could not be enforced in favor of the plaintiff except by a decree against it. Where the object of an action or suit is to recover the possession of real or personal property, the one in possession is a necessary and indispensable (and not a formal) party. The case of Wilson v. Oswego Township, 151 U. S. 56 [14 Sup. Ct. 259, 38 L. Ed. 70], is decisive on this point."

In each of these cases, it will be observed, the alleged separable controversy contained the same fundamental element and required the same determination essential to the establishment of complainant's right, as were involved in the whole controversy. In each, the sole question was whether complainant had performed or complied with the engagement or condition upon which depended his asserted title or right to the possession of the property. True, the party in possession disclaimed interest therein or right thereto; this, however, could not affect the legal aspect or character of the "controversy" disclosed in the bill, but served merely to indicate such party's attitude toward

or in the controversy; and, the nature and scope of a controversy having been determined, its separable or removable character calls for an inquiry respecting the status of parties in such controversy, and not the attitude or course which, having such status, they may elect to take.

The cases cited on behalf of the appellee, some of which we will discuss, are not inconsistent with the views above expressed; but, on the contrary, sustain us in the application of the tests to be applied in determining the removability of a cause.

In Geer v. Alkali Works, 190 U. S. 428, 23 Sup. Ct. 807, 47 L. Ed. 1122, complainants, minority shareholders in one of two defendant corporations, filed a bill in the state court to cancel a conveyance which such defendant corporation had made to the other. Both corporations were of citizenship diverse from complainants, and removed the cause. But the directors of the conveying corporation were made codefendants and were sought to be charged with the loss and damage suffered by their principal by reason of their tortious conduct. Some of such directors were of the same citizenship with one or more of complainants. This, of course, was fatal to federal jurisdiction unless their presence in the controversy relating to annulling the conveyance between the corporations, could be dispensed with. It was held that such controversy was separable. Clearly, this was a cause of action whose determination could be accomplished and full relief therein— in that controversy—could be granted, without the presence of the directors.

In Wallin v. Reagan (C. C.) 171 Fed. 758, an ejectment suit, the plaintiff joined a tenant at will as codefendant with the principal defendant. The tenant was a citizen of the same state as plaintiff; hence, if an indispensably necessary party to the suit, it could not be removed. The tenant had appeared and disclaimed interest in the lands. The court sustained the removal, observing that the tenant was not "anything more than a stakeholder and without real interest in the controversy." Now, irrespective of the question whether plaintiff in ejectment must join those who hold lesser estates under the principal defendant, the assumption that a tenant at will is a "stakeholder," and for that reason alone not an indispensable party, is at variance with the principles of Wilson v. Oswego Township, and the other cases referred to. The same criticism is applicable to Johnston Ry. Frog & Switch Co. v. Buda Foundry & Mfg. Co. (C. C.) 148 Fed. 883. In other words, the circumstance that a defendant is, or claims to be, a stakeholder, is not controlling.

In Fritzlen v. Boatman's Bank, 212 U. S. 364, 29 Sup. Ct. 366, 53 L. Ed. 551, the question of jurisdiction was presented upon an appeal from the Supreme Court of Kansas. The case, in another aspect, was before the Circuit Court of Appeals (135 Fed. 650, 68 C. C. A. 288), where the identical question of jurisdiction was considered and determined. These were the facts: A second mortgagee brought suit to foreclose. He joined as codefendant with the mortgagor, a first mortgagee, averring priority of his own mortgage and attacked the nominally first mortgage as fraudulent and void. The right of the first mortgagee (who was of different citizenship) to remove the

cause was sustained upon the ground that the issue of validity of his mortgage was separable from the essential elements comprising the issue in foreclosure. The case is an apt illustration of the proper application of the tests upon removal of causes. It is pointed out that, when a complainant seeks to foreclose a mortgage, the elements embodied in his case are: his debt; the default of the mortgagor; the rank of complainant's mortgage; and satisfaction, either through redemption or sale; that other mortgagees are made parties solely to ascertain and adjudicate the question of priority and thereby to fix and limit the redemption right. Therefore those who have or are charged to have junior liens are indispensably necessary to enable accomplishment of this element of the foreclosure purpose. If nothing further is charged, the cause of action or controversy is single and contains nothing which is separable from or not germane to the fundamental purpose of foreclosure—the latter involves the very idea of determining the rank of other liens which are assumed to be valid. But, when the complainant mortgagee charges that, because of fraud or other circumstances, the nominally senior mortgage is not only junior, but is fraudulent and void, he has injected an element not embodied in the foreclosure purpose. He can and must by his foreclosure bill litigate the rank of his own mortgage; but he cannot, as indispensably incident to the issue of rank or priority, seek to nullify the mortgagor's contracts with other defendants. He cannot, by injecting an issue of validity of a defendant's mortgage, seek an adjudication that there is no redemption right because there is no mortgage. His foreclosure purpose is accomplished when the rank of his mortgage relatively to other valid mortgages—acknowledged to be such—is determined. When therefore a defendant's mortgage is charged to be void, when it is sought to nullify it as a lien created by the mortgagor, then such defendant is made the object of a charge, a party to an issue or controversy which is not germane to an issue of priority; and a controversy arises which is separable therefrom, wholly determinable and full relief grantable therein, without the necessary presence of the parties to such issue of rank or priority.

Recurring now to the present case: Has Moloney in his bill alleged anything more than the contract with Cressler and the manner or means whereby he seeks to establish performance? The analysis of the Boatman's Case suggests, as an analogous situation, if the complainant second mortgagee therein, instead of alleging that the first mortgage is void, had averred that the defendant first mortgagee had taken his security with knowledge that the second mortgagee had already advanced money to the mortgagor, on the faith of a promise that he should have a first mortgage; therefore the nominally first mortgage should be reduced to a position of juniority. Under such circumstances, no separable controversy would appear; but the allegations would bear merely upon the issue of priority which is indispensably involved in the foreclosure purpose. So in the present case, the bill comprehends but a "single cause of action and a single ground of relief" (Wilson v. Oswego Township, supra), and, in its legal aspects and effect, the situation presented by the bill is no different than it

would be if Moloney had alleged the contract, payment, or performance, and upon the trial had sought to establish such allegations by proving the facts narrated in the bill. Every such fact, if established, also the result of any accounting, is relevant only to the fundamental issue of performance. It cannot be doubted that a suit for specific performance involves as necessary elements, though not as different or separable controversies, questions respecting the default of one party as an excuse for the other's failure to perform as agreed; that it is likewise permissible therein to show the acts of the parties under the contract and connected with its subject-matter, as bearing upon the right of the one to have, or the other to withhold, performance. While therefore complainant in the present case, if he so elected, might have sued Cressler for damages arising through the latter's breaches, and his misrepresentations respecting the subject-matter of the contract, also for the reasonable value of services rendered as stated, the inclusion of these matters in the present bill, for the purpose of establishing one of the elements necessarily comprised within its issues, does not bring in a separable controversy.

It may be added that the allegations just referred to can be ignored, and complainant's bill would still stand as one seeking plainly to enforce specific performance grounded (1) upon the contract, (2) the partial payment made, (3) the disputed balance, and (4) complainant's willingness to pay whatever sum may be found due—his offer to do equity. The fact that he has not literally performed by paying the full money consideration stipulated in the contract does not make the bill frivolous, thus justifying the claim that Harris & Co. are fraudulently joined. In a suit for specific performance, an offer by complainant to justify his own nominal default and to show that it is not a real default, coupled with an offer to perform as may be adjudged, is consonant with equity. 4 Pomeroy, Eq. Jur. 1407. Therefore, irrespective of the question whether Moloney's claims for recoupment are allowed or allowable, Harris & Co., as escrow or bailee, are given a status as indispensable parties in the suit for specific performance, to enable granting the complete relief sought by the bill; they are indispensable to the end that complainant may have the fruition of the decree prayed, if it is awarded. Crump v. Thurber, Wilson v. Oswego Township, and Construction Co. v. Cane, supra.

Some of the defendants who comprise the firm of Harris & Co. are citizens of Illinois, the state of complainant's citizenship. The cause was therefore not removable by the defendant Cressler.

The judgment is reversed, with directions to grant the motion to remand the cause to the state court.

## On Cross-Appeal.

PER CURIAM. This is a cross-appeal by Cressler from the decree considered in No. 1,912, herewith decided. In view of the conclusions reached in that case, the decree is reversed at Cressler's costs, and the cause is remanded to the District Court, with the direction to remand to the state court.